1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    KATHRYN COX et al.,                              CASE NO. C13-2288 MJP

11                            Plaintiffs,              ORDER ON MOTION TO DISMISS
                                                       AND MOTIONS TO COMPEL
12          v.

13    CONTINENTAL CASUALTY
      COMPANY,
14
                              Defendant.
15

16

17          THIS MATTER comes before the Court on Defendant Continental Casualty Company's

18   ("Continental's") Motion to Dismiss (Dkt. No. 13) all counts of Plaintiffs' Complaint (Dkt. No.

19   1-1) alleging bad faith, breach of contract, violation of the Washington Insurance Fair Conduct

20   Act ("IFCA"), violation of the Consumer Protection Act ("CPA"), and negligence—all arising

21   out of Continental's professional liability policy with Plaintiffs' former dentist Dr. Duyzend. In

22   addition, Continental moves to compel the production of attorney-client privileged documents

23   from (1) the Cox Plaintiffs, regarding Dr. Duyzend and/or Continental's ability to settle and their

24   own willingness to settle (Dkt. No. 37 at 6–9), (2) the Cox Plaintiffs, related to the termination of

1    their former counsel (Dkt. No. 37 at 9–10), (3) Gregory Harper (the attorney who represented Dr.

2    Duyzend after Continental recommended he obtain separate counsel) (Dkt. No. 48), and (4)

3    Stuart Kastner, former personal counsel to Dr. Duyzend (hired after the judgment against Dr.

4    Duyzend had been entered) (Dkt. No. 41). Having reviewed the Motion to Dismiss, Plaintiffs'

5    Response (Dkt. No. 14), Defendant's Reply (Dkt. No. 42); the April 4 LCR Joint Submission

6    (Dkt. No. 37); the April 25 LCR Joint Submission Regarding Continental's Motion to Compel

7    Mr. Harper (Dkt. No. 48); Defendant's Motion to Compel Mr. Kastner (Dkt. No. 41), Plaintiffs'

8    Response (Dkt. No. 43), Mr. Kastner's Response (Dkt. No. 45), Plaintiff's Reply (Dkt. No. 47);

9    and all related papers, the Court hereby GRANTS the Motion to Dismiss in part and DENIES it

10   in part and DENIES each of the motions to compel.

11                                   **Background**

12            In their Complaint, originally filed in state court, Plaintiffs allege Continental is liable for

13   the tort of bad faith and related claims in its handling of hundreds of dental malpractice claims

14   against its insured, Dr. Duyzend. (Compl., Dkt. No. 1-1 at 5.) Plaintiffs bring the action on behalf

15   of Dr. Duyzend pursuant to a settlement and assignment of claims from Dr. Duyzend to

16   Plaintiffs. (See Dkt. No. 1-1 at 7.) The claims are based on the manner in which Continental

17   sought to settle the malpractice allegations: Over the course of several years from 2008 to 2012,

18   Continental settled individual claims sequentially rather than pursuing a global settlement of all

19   claims against its insured. (Dkt. No. 1-1 at 6.) Plaintiffs allege there were multiple opportunities

20   to pursue such a settlement, including a suggestion in 2008 by Plaintiffs' former counsel Mr.

21   Longfelder, who represented 198 former patients of Dr. Duyzend, that Continental tender the

22   policy limits. (Dkt. No. 13-1 at 2, cited in Dkt. No. 1-1 at 6.) According to Plaintiffs, Continental

23   failed to respond to Mr. Longfelder's letter. (See Dkt. No. 1-1 at 6.) Plaintiffs concede

24

1  Continental attempted to negotiate a global settlement with the remaining claimants, including

2  Plaintiffs, four years later. (Dkt. No. 1-1 at 7; Dkt. No. 13 at 12.) After rejecting the proposed

3  settlement, Plaintiffs proceeded to arbitration and secured a $35,212,000 judgment against Dr.

4  Duyzend. (Dkt. No. 1-1 at 7.) Some of the judgment was recovered from Dr. Duyzend's personal

5  assets prior to the filing of the bad faith complaint. (Dkt. No. 1-1 at 7.)

6         In the summer of 2013, soon after the judgment against Dr. Duyzend was entered,

7  Continental filed an interpleader and declaratory judgment action in this Court regarding the

8  disposition of remaining policy limits and Continental's remaining obligations under the policy.

9  (See Case No. C13-1508MJP.) Pursuant to the Parties' stipulation (Case No. 3-13-1508MJP,

10  Dkt. No. 81), the interpleader action has now been partially mooted by Continental's

11  disbursement of remaining policy limits to the Plaintiffs and partially consolidated with this

12  action, which seeks to determine Continental's contract, tort, and statutory liability for damages

13  beyond the policy limits.

14         Continental now moves to dismiss the bad faith action on the basis that its conduct as

15  alleged by Plaintiffs fails to state a claim for bad faith, breach of conduct, violation of the IFCA,

16  violation of the CPA, or negligence. (Dkt. No. 13.) In separate but related motions, Continental

17  moves to compel the production of attorney-client privileged documents from (1) the Cox

18  Plaintiffs, regarding Dr. Duyzend and/or Continental's ability to settle and their own willingness

19  to settle, on the basis that Plaintiffs put the information at issue by bringing a bad faith claim

20  (Dkt. No. 37 at 6–9), (2) the Cox Plaintiffs, related to the termination of their former counsel, on

21  the basis that they put these communications at issue by stating in their complaint that they

22  terminated their former attorney because they were tired of "delays" by Continental in

23  processing their claims (Dkt. No. 37 at 9–10), (3) Mr. Harper, on the basis that Dr. Duyzend

24

1   waived his privilege when he asked Mr. Harper to provide the documents to Plaintiffs, that

2   Plaintiffs waived the privilege by bringing the bad faith claim, and that some of the documents

3   are not privileged because they were communications between Mr. Harper, Dr. Duyzend, and

4   counsel for Plaintiffs (Dkt. No. 48 at 2–3), and (4) Mr. Kastner, on the basis that Dr. Duyzend

5   waived his privilege with Mr. Kastner by providing Plaintiffs with attorney-client privileged

6   documents from Mr. Harper and that Plaintiffs waived the privilege by bringing the bad faith

7   claim (Dkt. No. 41 at 1–2).

8                                            **Analysis**

9   I.      <u>Motion to Dismiss</u>

10         a.   <u>Legal Standard</u>

11       To survive a motion to dismiss, a complaint must state a claim for relief that is plausible

12   on its face. Fed. R. Civ. P. 12(b)(6); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). A claim is

13   facially plausible "when the plaintiff pleads factual content that allows the court to draw the

14   reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> Plausibility does

15   not mean probability, "but it asks for more than a sheer possibility that a defendant has acted

16   unlawfully." <u>Id.</u> Merely reciting the elements of a cause of action will not suffice. <u>Bell Atl. Corp.</u>

17   <u>v. Twombly</u>, 550 U.S. 544, 555 (2007).

18       The Court follows a two-step approach when deciding whether a complaint survives a

19   12(b)(6) motion. <u>Iqbal</u>, 556 U.S. at 678–79. First, "a court must accept as true all of the

20   allegations contained in a complaint" unless the allegations are legal conclusions. <u>Id.</u> Second, the

21   Court must decide whether the claim for relief is plausible—a context-specific task. <u>Id.</u> The

22   Court may consider "documents attached to the complaint, documents incorporated by reference

23   in the complaint, or matters of judicial notice" when making its determination. <u>United States v.</u>

24   <u>Ritchie</u>, 342 F.3d 903, 908 (9th Cir. 2003).

1       b.  <u>The Tort of Bad Faith</u>

2       Washington recognizes that an insurer can incur liability "for a failure to adjust or

3 compromise a claim within the limits of liability, if that failure is attributable to negligence or

4 bad faith." <u>Hamilton v. State Farm Ins. Co.</u>, 83 Wn.2d 727, 791 (1974). Indeed, "it is the

5 affirmative duty of the insurer to make a good faith attempt to effect settlement." <u>Id.</u> (citing

6 <u>Burnham v. Commercial Cas. Ins. Co.</u>, 10 Wn.2d 624 (1941)). "The flat refusal to negotiate,

7 under circumstances of substantial exposure to liability, a demonstrated receptive climate for

8 settlement, and limited insurance coverage may show lack of good faith as well." <u>Id.</u> (citing

9 <u>Tyler v. Grange Ins. Ass'n</u>, 3 Wn.App. 167, 179 (1970)). A frequently stated standard for

10 assessing an insurer's good faith is that an insurer must make its decision as to whether to settle

11 or go to trial "as though no policy limit of liability existed." <u>See, e.g.</u>, <u>Tyler v. Grange Ins.</u>

12 <u>Assoc.</u>, 3 Wn.App. 167, 178 (1970). In other words, the insurer must regard the portion of the

13 potential judgment that lies beyond the policy limits with as much gravity as it regards the threat

14 to its own policy funds. Whether an insurer acted in bad faith is ultimately a question of fact. <u>See</u>

15 <u>Smith v. Safeco Ins. Co.</u>, 150 Wn.2d 478, 485 (2003).

16       Continental alleges that Plaintiffs fall short of plausibility because they have not

17 adequately alleged that an opportunity to settle the claims on a global basis existed. (<u>See</u> Dkt.

18 No. 13 at 14.) But the existence of an unmistakable "opportunity" to settle all claims is not an

19 explicit element of the tort of bad faith in Washington. <u>See</u> <u>Safeco Ins. Co.</u>, 150 Wn.2d at 485

20 ("Claims by insureds against their insurers for bad faith are analyzed applying the same

21 principles as any other tort: duty, breach of that duty, and damages proximately caused by any

22 breach of duty."). While an insured must plausibly allege that the insurer's conduct was

23 "unreasonable, frivolous, or unfounded," <u>id.</u>, Washington courts have not yet given a clear

24 answer to the question whether an insurer has an affirmative duty to initiate settlement

1   negotiations in the absence of a within-limits offer by claimants. <u>See</u> 3 Appleman on Insurance §

2   23.02(6)(d)(iii) (describing a split of authority among the states on the question).

3        The weight of the evidence, however, indicates Washington does not consider a within-

4   limits offer a requirement. <u>See, e.g.</u>, <u>Moratti ex rel. Tarutis v. Farmers Ins. Co. of Washington</u>,

5   162 Wn.App. 495, 504 (2011) ("We can give no credence to Farmers' assertion that it did not

6   have to respond until [two years later] because no settlement offer or demand was made or suit

7   filed until then."); <u>id.</u> at 507–08 ("An insurer has a duty make a good faith effort to settle a claim,

8   including an obligation to conduct good faith settlement negotiations sufficient to ascertain the

9   most favorable terms available."). Language used or approved by the Washington Supreme

10  Court also implies that an offer by the claimants is not a necessary prerequisite—for example,

11  references to "the affirmative duty of the insurer to make a good faith attempt to effect

12  settlement." <u>Hamilton</u>, 83 Wn.2d at 791; <u>cf.</u> <u>Travelers Indem. of Conn. v. Arch Specialty Ins.</u>

13  <u>Co.</u>, No. C11-1601JLQ, 2013 WL 6198966 (E.D. Cal. Nov. 23, 2013) ("California case law, and

14  the California Insurance Code speak of a 'duty to effectuate settlement'. It is not merely a duty to

15  accept reasonable settlement offers. 'Effectuate' means 'to put into force or operation.'

16  Therefore, to act in good faith, and to attempt to effectuate settlement, Travelers was required to

17  do something in an attempt to bring about a settlement.") (citations omitted).

18       The facts needed to prove a "demonstrated receptive climate for settlement," <u>Hamilton</u>,

19  83 Wn.2d at 791, are undefined. Claimants at minimum need to broach the topic of settlement,

20  but Plaintiffs adequately allege that fact. <u>See</u> Dkt. No. 13-1 at 2 (letter from Plaintiffs' former

21  counsel at the time he represented 198 claimants to Continental, stating, "I suggest that a tender

22  of the policy limits of $8 million be considered as a way to protect Dr. Duyzend's personal assets

23  from judgment on these claims"). Continental's demand that Plaintiffs plausibly allege not only a

24

1    "receptive climate for settlement" but an unmistakable offer from all known and potential

2    claimants accompanied by an explicit promise of a release from liability (Dkt. No. 13 at 15) has

3    no apparent basis in Washington law. Instead, Continental cites a First Circuit case applying

4    Massachusetts law, Peckham v. Continental Cas. Ins. Co., 895 F.2d 830 (1st Cir. 1990), which

5    held that the question whether claimants would have settled within policy limits is a causation

6    question properly determined by a jury. Id. at 839. Even if that subjective question were relevant

7    to bad faith in Washington (and the "demonstrated receptive climate" standard strongly indicates

8    that it is not), Peckham would not support the legal foreclosure of the claim at this stage in the

9    proceeding.

10         Continental also errs by trying to shift the burden of production to Plaintiffs on the

11   question whether Continental might have had a reasonable basis to act as it did. (Dkt. No. 13 at

12   16.) Plaintiffs need not negate potential defenses at this stage in the proceeding. See Procter &

13   Gamble Co. v. King County, 9 Wn.2d 655, 659–60 (1941). While Plaintiffs must plausibly allege

14   that Continental acted unreasonably, Plaintiffs are not required to counter the various scenarios

15   in which Continental hypothesizes it might have acted reasonably in the absence of any evidence

16   on the matter—for example, that Dr. Duyzend refused to consent to a settlement or that

17   Continental was not timely told about the extent of Plaintiffs' injuries. Further, Continental's

18   reliance on Stouffer & Knight v. Cont'l Cas. Co is misplaced: It considered the insured's

19   approval of his own attorney's conduct of an investigation at the summary judgment stage when

20   facts outside the pleadings could be considered. 96 Wn.App. 741, 753–54 (1999).

21         Finally, Continental's argument that the bad faith claim is foreclosed by the statute of

22   limitations to the extent that the claim relies on WAC violations is unpersuasive. It is true that

23   Judge Robart held that a claim of bad faith based on violations of WAC provisions was time-

24

1  barred by the operation of RCW 4.16.080 where the limitations period ran from the time of the

2  alleged violation. See Walker v. Metro. Prop. & Cas. Ins. Co., No. C12–0173JLR, 2013 WL

3  942554, *4 (March 8, 2013). But Judge Robart also held that the plaintiffs had not adequately

4  alleged damages, a necessary element of their bad faith claim. Id. at *5. Where, as here, Plaintiffs

5  allege damages arising from an excess judgment against Dr. Duyzend, the bad faith claim does

6  not accrue and the injured party is not eligible to apply for relief until that judgment is entered.

7  See Moratti, 162 Wn.App. at 498–99. Since the judgment against Dr. Duyzend was entered in

8  2013, Plaintiffs filed their bad faith claim well within the statute of limitations even if the WAC-

9  violating conduct occurred earlier.

10       At this stage in the proceeding, the Court must accept Plaintiffs' factual allegations as

11  true. Plaintiffs plausibly allege that Continental acted in bad faith by disregarding the significant

12  risk of a judgment exceeding the policy limits when it ignored a letter proposing settlement

13  discussions from an attorney representing 198 claimants (constituting a plurality of the known

14  and potential claimants) in 2008, and instead pursued a strategy of settling each claim

15  individually over the course of several years, eventually resulting in a judgment of more than $35

16  million against Dr. Duyzend. Continental's motion to dismiss the bad faith claim is denied.

17            c.   Breach of Contract

18       Continental argues Plaintiffs fail to state a claim for breach of contract because violations

19  of the Washington Administrative Code cannot give rise to a breach of contract, citing Hann v.

20  Metro. Cas. Ins. Co., No. 12-5031RJB, 2012 WL 3090977 (W.D. Wash. June 29, 2012).

21  Plaintiffs counter that Hann failed to acknowledge the Washington Supreme Court's holding in

22  St. Paul Fire and Marine Ins. Co. v. Onvia, Inc., 165 Wn.2d 122, 132 (2008)—but that case held

23  that WAC violations can give rise to a bad faith claim, not breach of contract.

24

1    Plaintiffs also note that Dr. Duyzend's policy included terms relating to the duty to

2    defend and indemnify Dr. Duyzend, but Plaintiffs' Complaint does not appear to allege breach of

3    those contract terms. (See Dkt. No. 1-1 at 7–8.) Plaintiffs' breach of contract claim is therefore

4    dismissed with leave to amend.

5         d.   IFCA Violation

6    An IFCA claim arises when "[a]ny first party claimant to a policy of insurance . . .  is

7    unreasonably denied a claim for coverage or payment of benefits by an insurer." RCW 48.30.015

8    (emphasis added). The Parties dispute whether Continental's alleged bad-faith conduct

9    constituted a "deni[al of] a claim for . . . payment of benefits" or merely a delay in payment.

10   (Dkt. No. 13 at 26; Dkt. No. 14 at 23–24; Dkt. No. 42 at 15.)

11   Washington defines first-party insurance as a policy that "pay[s] specified benefits

12   directly to the insured when a 'determinable contingency' occurs," "allow[ing] an insured to

13   make her own personal claim for payment against her insurer." Mut. of Enumclaw Ins. Co. v.

14   Dan Paulson Const., Inc., 161 Wn.2d 903, 914 n.8 (2007) (citing Thomas W. Harris, Washington

15   Insurance Law § 1.2 (2d ed. 2006)). An example is renter's insurance. In contrast, a third-party

16   insurance policy "indemnif[ies] an insured for covered claims which others [third-party

17   claimants] file against him." Id. The professional liability policy Dr. Duyzend had with

18   Continental is a third-party policy. Thus, he was never a "first party claimant" under the IFCA

19   and could not assign an IFCA claim to Plaintiffs. The reason why it seems like a bad fit to say

20   Dr. Duyzend was "denied a payment of benefits" is that his third-party insurance policy never

21   entitled him to such a payment in the first place.

22   Continental's motion to dismiss the IFCA claim is therefore granted.

23

24

e.  <u>CPA Violation</u>

To prevail on a CPA claim, Plaintiffs must satisfy the five-part test announced in

<u>Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.</u>, 105 Wn.2d 778 (1986): (1) an

unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest,

(4) which causes injury to the party in his business or property, and (5) which injury is causally

linked to the unfair or deceptive act. <u>Id.</u> at 784–85. In contrast to the breach of contract context,

conduct that violates the bad-faith-related provisions of the WAC can give rise to the first two

prongs of a CPA violation, as long as the other three parts of the test are met. <u>See</u> <u>Indus. Indem.</u>

<u>Co. of the Northwest, Inc. v. Kallevig</u>, 114 Wn.2d 907, 923 (1990); <u>Onvia</u>, 165 Wn.2d at 134.

The third prong is also met in most insurance cases. <u>See</u> <u>Aecon Bldgs., Inc. v. Zurich N. Am.</u>,

572 F. Supp. 2d 1227, 1238 (W.D. Wash. 2008). Dr. Duyzend experienced injury when the

judgment was entered against him and when he liquidated assets to settle with Plaintiffs (which

also belies Continental's claims that the timing of the underlying WAC violations make the CPA

claim time-barred). Plaintiffs have plausibly alleged a CPA violation and the Court denies

Continental's motion to dismiss it.

f.  <u>Negligence</u>

Continental argues the parties agreed in the insurance contract that damages would be

limited to the policy limits and Continental has already paid those funds directly to claimants and

to Plaintiffs through the interpleader action, preventing Plaintiffs from showing damages for

their negligence claim. (<u>See</u> Policy, Dkt. No. 13-2 at 44.) However, it is not clear why claims

sounding in tort would necessarily be limited to contract damages.

Continental's contention that it was <u>precluded</u> from attempting to settle within limits

because Washington law prohibits any consideration of the policy limits (Dkt. No. 13 at 29) can

be dismissed out of hand. Clearly, in order to limit the insured's personal exposure, the insurance

1    company must take into consideration the point at which a settlement or judgment would cease

2    to affect only the funds available under the policy and begin to encroach on the insured's

3    personal assets. Washington law is clear on that point. <u>See, e.g.</u>, <u>Tyler</u>, 3 Wn.App. at 197

4    ("Washington has held that the insurer is liable if he [sic] is guilty of either bad faith or

5    negligence in failing to settle a claim against the insured <u>within its policy limits</u>.") (emphasis

6    added); <u>id.</u> at 197–98 ("[T]he presence of a number of acts affected the 'good faith' posture of

7    the insurer: The severity of plaintiff's injuries giving rise to the likelihood of a verdict <u>greatly in</u>

8    <u>excess of policy limits</u>; . . . . failure of the insurer to inform the insured of a compromise offer

9    <u>within or near the policy limits</u>; pressure by the insurer on the insured to make a contribution

10   towards a compromise settlement <u>within the policy limits</u> as an inducement to settlement by the

11   insurer; and actions which demonstrate greater concern for the insurer's monetary interest <u>than</u>

12   <u>the financial risk attendant to the insured's predicament</u>.") (emphasis added).

13        Finally, Continental's argument that any WAC-based negligence claim is necessarily

14   time-barred has already been refuted above.

15        Plaintiffs have adequately asserted a claim for negligence against Continental and the

16   Court denies Continental's request to dismiss the claim.

17            g.   <u>Compulsory Counterclaims</u>

18        As Continental notes, it waived the compulsory counterclaim argument pursuant to the

19   Parties' stipulation. (Dkt. No. 42 at 16 n. 6.) The Court will not consider it.

20   II.   <u>Motions to Compel</u>

21        Continental also asks the Court to compel production of several categories of attorney-

22   client privileged documents.

23

24

1            a.  <u>Attorney-Client Privilege Materials Regarding Plaintiffs' Willingness to Settle</u>

2            In the Parties' April 4 LCR 37 motion to compel (Dkt. No. 37), Continental first seeks

3      "documents related to Dr. Henri Duyzend and/or Continental's ability to settle Cox et al.'s

4      claims against Dr. Duyzend, including internal communications about settlement, settlement

5      opportunities, actual or contemplated settlement demands, documents demonstrating Cox et al.'s

6      willingness to settle claims (and if so, on what terms), and any valuations of their claims

7      (Request Nos. 12–16, 19–20, 28)." (<u>Id.</u> at 1.) Continental argues Plaintiffs waived any attorney-

8      client privilege with respect to these documents by bringing the bad faith claim.

9            Waiver of attorney-client privilege in Washington occurs when "(1) assertion of the

10     privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2)

11     through this affirmative act, the asserting party put the protected information at issue by making

12     it relevant to the case; and (3) application of the privilege would have denied the opposing party

13     access to information vital to his defense." <u>Pappas v. Holloway</u>, 114 Wn.2d 198, 207 (1990).

14           Continental cites <u>Utica Mut. Ins. Co. v. Lifequotes of Am., Inc.</u>, No. C06-0228EFS, Dkt.

15     No. 329 at 8–9 (E.D. Wash. Dec. 22, 2010), to support the claim that Plaintiffs have waived any

16     attorney-client privilege applicable to these materials by bringing a bad faith claim against

17     Continental. Judge Shea of the Eastern District determined that since causation would ultimately

18     be at issue in the case, the willingness of the plaintiff to settle the underlying action was relevant

19     to the insurer's defense. <u>See id.</u> However, as discussed above, Washington law bases bad faith

20     liability primarily on the insurer's observable conduct. <u>See</u> <u>Hamilton</u>, 83 Wn.2d at 791 (1974)

21     ("[I]t is the affirmative duty of the insurer to make a good faith attempt to effect settlement.").

22     Plaintiff's own objectively observable conduct is also relevant: "The flat refusal to negotiate,

23     under circumstances of substantial exposure to liability, a <u>demonstrated</u> receptive climate for

24     settlement, and limited insurance coverage may show lack of good faith as well." <u>Id.</u> (emphasis

1   added). Although Judge Shea cited <u>Hamilton</u>, he did not explain why Plaintiffs' subjective

2   willingness to settle would play any role.

3         Continental further alleges that it is entitled to this material to prove a bad-faith setup on

4   the part of Plaintiffs. Continental has not shown that subjective evidence of a bad-faith setup is

5   relevant to a bad faith defense in Washington. Indeed, the federal district court case cited by

6   Continental on this point compelled production of only non-attorney-client-privileged documents

7   and ordered a production of a privilege log with respect to those for which the producing party

8   claimed privilege. See <u>RSUI Indem. Co., Inc. v. Vision One, LLC</u>, No. No. C08- 1386RSL, 2009

9   WL 5125460, *2 (W.D. Wash. Dec. 8, 2009). <u>See also</u> <u>Home Indemnity Co. v. Lane Powell</u>

10  <u>Moss and Miller</u>, 43 F.3d 1322 (9th Cir. 1995) (applying Alaska law of bad faith to hold that

11  regardless of bad faith set-up allegations, lack of subjective intent to settle was not sufficiently

12  vital to overcome privilege where plaintiffs demonstrated they had made a written offer to

13  settle). Finally, communications between Plaintiffs and Dr. Duyzend's personal counsel should

14  evidence any indication of collusion between those parties, if it exists.

15        Because purely subjective attorney-client privileged material is not relevant to Plaintiffs'

16  bad faith claim, the <u>Pappas</u> test for waiver is not fulfilled. Continental's Motion to Compel is

17  therefore denied with respect to materials relating to Plaintiffs' willingness to settle.

18              b.  <u>Reason for Terminating Mr. Longfelder</u>

19        In the same motion, Continental alleges it is entitled to letters terminating Mr.

20  Longfelder's representation (Request Nos. 19, 20) on the basis that Plaintiffs put their true

21  motives for terminating Mr. Longfelder at issue by stating in their complaint that they had done

22  so "because they had grown tired of the delays by Continental." (Dkt. No. 37 at 9; <u>see</u> Dkt. No.

23  1-1 at 13.) Contrary to Continental's argument, Plaintiffs' motive for terminating Mr. Longfelder

24  is not "an element" of their bad faith claim (Dkt. No. 37 at 9), and Plaintiffs have not made this

1   fact "relevant" to their case in the sense that <u>Pappas</u> uses the phrase. Furthermore, Continental

2   has fallen far short of demonstrating that Plaintiffs' true motive for terminating their former

3   counsel is "vital" to Continental's defense of the bad faith claim. If a party can obtain the same

4   information from a deposition, no waiver occurs. <u>See</u> <u>1st Security Bank of Washington v.</u>

5   <u>Eriksen</u>, No. C06-1004RSL, 2007 WL 188881, *3 (W.D. Wash. Jan. 22, 2007) ("[T]he

6   information sought must be 'vital' to defendants' case, meaning that the information is available

7   from no other source.").

8               c.   <u>Mr. Harper's Attorney-Client Privileged Documents</u>

9           In the April 25 LCR 37 motion to compel, Continental seeks to compel production of

10   attorney-client privileged documents from Mr. Greg Harper. (Dkt. No. 48; Dkt. No. 20-2 at 2–

11   13.) However, these documents are not reasonably calculated to lead to the discovery of

12   admissible evidence.

13           Dr. Duyzend hired Mr. Harper to represent him individually after Continental

14   recommended that he obtain personal counsel in the underlying litigation. Continental notes that

15   Mr. Harper was "directly involved in Dr. Duyzend's defense from [2011] forward—approving

16   settlement offers and settlements and directing Continental as to Dr. Duyzend's demands with

17   respect to all major decisions in the case." (Dkt. No. 48 at 3.) Attorney-client privilege would not

18   attach to any communications between Mr. Harper and attorneys for Continental at this stage in

19   the litigation where the conflict of interest had been formalized, and certainly not to

20   communications between Mr. Harper and attorneys for Plaintiffs, so Continental should be able

21   to obtain documents reflecting both "approval" of settlement offers and "direct[ion to]

22   Continental" as to Dr. Duyzend's demands.  (<u>See</u> Dkt. No. 48 at 14 (Plaintiffs concede that

23   certain communications between Mr. Harper and persons other than Dr. Duyzend were

24   miscategorized as privileged by Mr. Harper and promise to produce them)).

1    As discussed above, bad faith in Washington is primarily a question of objectively

2    observable conduct on the part of the insurer—not that of its insured or claimants. In its

3    alternative argument on issue injection, Continental makes some attempt at a showing that the

4    documents are "vital"—a much higher bar than relevance or discoverability—but it does so by

5    citing one malpractice case where attorney-client communications were clearly central to the

6    case, see Pappas, 114 Wn.2d at 208, and another case where a collusive bad faith setup had been

7    alleged in some detail. RSUI Indem. Co., Inc., 2009 WL 5125460, at *2. Even there, attorney-

8    client privilege was not overcome. Id. Continental has failed to show that Dr. Duyzend's

9    subjective attitude toward settlement, communicated solely to his personal counsel, has any

10   impact on the claims asserted against it.

11          d.   Mr. Kastner's Attorney-Client Privileged Documents

12   In a separate motion, Continental seeks attorney-client privileged material from Mr.

13   Kastner, former personal counsel to Dr. Duyzend (hired after the judgment was entered), on the

14   basis that Dr. Duyzend waived his privilege with Mr. Kastner by providing Plaintiffs with

15   attorney-client privileged documents from Mr. Harper and that Plaintiffs waived the privilege by

16   bringing the bad faith claim (Dkt. No. 41 at 1–2).

17   Mr. Kastner was responsible for negotiating the settlement between Plaintiffs and Dr.

18   Duyzend after the judgment was entered. (Kastner Resp. to Mot. Compel, Dkt. No. 45 at 2.)

19   Because Plaintiffs' claims are based on Continental's alleged bad faith prior to judgment being

20   entered against Dr. Duyzend, the request for Mr. Kastner's attorney-client-privileged

21   communications is not reasonably calculated to lead to admissible evidence and the Court will

22   not compel their production.

23

24

1

**Conclusion**

2      Continental's Motion to Dismiss (Dkt. No. 13) is DENIED as to Plaintiffs' bad faith,

3   CPA, and negligence claims because Plaintiffs plausibly allege conduct giving rise to liability

4   under these theories, GRANTED as to Plaintiff's IFCA claim because Dr. Duyzend was never a

5   first-party claimant with standing to bring claims under that statute, and GRANTED as to

6   Plaintiffs' breach of contract claim with leave to amend so that Plaintiffs may identify specific

7   contractual terms that were breached. Continental's Motions to Compel (Dkt. Nos. 37, 48, and

8   41) are DENIED because the requests are not reasonably calculated to lead to the discovery of

9   admissible evidence and/or they are not sufficiently vital to Continental's defense to trigger

10  waiver of attorney-client privilege by affirmative act under <u>Pappas v. Holloway</u>.

11

12      The clerk is ordered to provide copies of this order to all counsel.

13      Dated this 16th day of May, 2014.

14

15

16      _____
        Marsha J. Pechman

17      Chief United States District Judge

18

19

20

21

22

23

24