UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KATHRYN COX et al.,

                Plaintiffs,

    v.

CONTINENTAL CASUALTY
COMPANY,

                Defendant.

CASE NO. C13-2288 MJP

ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendant Continental Casualty Company's Motion for Summary Judgment (Dkt. No. 98) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 109). Having reviewed the Motions, the Responses (Dkt. Nos. 111, 116), the Replies (Dkt. Nos. 114, 123), and all related papers, and having heard oral argument on November 14, 2014, the Court hereby DENIES Continental's Motion in part and GRANTS it in part and DENIES Plaintiffs' Motion in part and GRANTS it in part.

**Background**

This case was brought by the Cox Plaintiffs, assignees of Dr. Duyzend, against Dr. Duyzend's insurer, Continental Casualty Company, alleging bad faith, breach of contract, negligence, and consumer protection violations in Continental's handling of hundreds of dental malpractice claims (including Plaintiffs') against Dr. Duyzend. (Compl., Dkt. No. 1-1 at 5.) On Continental's prior motion to dismiss, the Court dismissed Plaintiff's Insurance Fair Conduct Act ("IFCA") claim but allowed the other claims to proceed. (Dkt. No. 56.) Plaintiffs moved for reconsideration on the dismissal of the IFCA claim, and the Court denied the motion. (Dkt. No. 73.)

The events and circumstances giving rise to Plaintiffs' bad faith claim took place over the course of approximately four years. After dentist Dr. Duyzend retired in December 2007 and sold his practice, the dentist who had purchased the practice, Dr. To, began to notice a pattern of substandard, failing, and unnecessary root canals, among other problems attributable to Dr. Duyzend's dental work. (See To Interrogatory Answers at Arbitration, Dkt. No. 103, Ex. 7 at 3; To Decl., Dkt. No. 103, Ex. 8 at 3–8.) In a 2008 suit Dr. To filed against Dr. Duyzend for misrepresenting the nature of his practice and its profits, Dr. To alleged, "[t]he vast majority of patients have multiple root canals; several with over 20 and some as many as 28." (Dkt. No. 103, Ex. 7 at 8.) Dr. To further claimed Dr. Duyzend had falsified patient charts and used an electric vitality testing device with the batteries removed to generate documentation justifying unnecessary root canals. (Id. at 9.)

Dr. Duyzend had purchased an insurance policy with $8 million aggregate and $5 million per-claim limits from Continental in 2007. (Dkt. No. 103, Ex. 1 at 1.) The policy provided that Continental would "not settle any claim without your consent," excluded coverage for intentional

acts, and contained a void-for-fraud provision and a limitation of liability. (Dkt. No. 103, Ex. 2 at 73, 74–75, 59.) Mr. Versnel first heard about the claims in late April or early May 2008, and Continental formally retained him to represent Dr. Duyzend on or around May 8, 2014. (Versnel Decl., Dkt. No. 104 at 2.) In his deposition Mr. Versnel testified that during an early conversation between Mr. Versnel and Dr. To, Mr. Versnel supplied the name of Mr. Longfelder, a solo practitioner who had experience with dental malpractice cases, as an attorney to whom Dr. To might refer his patients (along with one or two other names). (Versnel Dep., Dkt. No. 103, Ex. 62 at 111:7–112:3.) (Continental disputes the suggestion that Plaintiffs would not have heard about Mr. Longfelder but for Dr. To, arguing that Dr. To and his office assistant referred patients to Mr. Longfelder—these facts may or may not be inconsistent. (See, e.g., 5/8/2014 Letter from Dr. To to patients, Rosato Decl. in Support of Pl's Opp., Dkt. No. 112, Ex. 2 at 30.))

Although Dr. Duyzend's policy excluded coverage for intentional conduct (Dkt. No. 103, Ex. 2 at 74–75), no reservation of rights on intentional conduct was issued at this time. (See Versnel Dep., Dkt. No. 103 at 42:7–44:19; Hoffman Dep., Dkt. No. 112, Ex. 1 at 92:20–94:21.) Neither Mr. Versnel nor anyone at Continental attempted to estimate the aggregate value of the claims against Dr. Duyzend either in settlement or at trial until at least 2011 and possibly 2012. (Versnel Dep., Dkt. No. 103 at 116:4–117:20; Kunz Dep., Dkt. No. 110 at 69:12–70:17, 78:5–80:13; 79:13–21; Hoffman Dep, Dkt. No. 112, Ex. 1 at 96:19–97:5.) Furthermore, Continental's initial claims adjustor on the Duyzend matters, Doug Hoffman, failed to elevate the claims to CLEM, the special unit at Continental whose function was to address high value (in excess of $1 million) or complex claims. (Hoffman Dep., Dkt. No. 112, Ex. 1 at 95:10–21, 96:7–18, 191:4–192:1.)

1    The period from May 2008 through summer 2011 is subject to a great number of factual

2    disputes between the parties about to what degree the strategies employed by Mr. Versnel,

3    Continental, and Dr. Duyzend on the one hand and Mr. Longfelder on the other hand were

4    reasonable in light of the circumstances. The parties particularly dispute the source of the delays

5    in settling claims. It is, however, undisputed that Mr. Versnel employed a claim-by-claim

6    approach to settling cases and generally expected Mr. Longfelder to supply records and demands

7    prior to making settlement offers. (Longfelder Dep., Dkt. No. 103 at 83:4–12 (Versnel

8    communicated to Longfelder that CNA was going to handle claims on an individual basis);

9    Versnel Dep., Dkt. No. 103, Ex. 62 at 33:23–34:8 (most common way to get records presuit is

10   through plaintiff's counsel); 36:25–37:21 ("[W]e were relying on Mr. Longfelder to get us the

11   records."); see also Longfelder Dep., Dkt. No. 103, Ex. 17 at 48:16–22 (Longfelder believed it

12   was reasonable for Versnel to ask him to obtain records).) It is also undisputed that Mr.

13   Longfelder was a solo practitioner and that he privately decided to employ a first-retained, first-

14   settled method of submitting patient records and demands to Mr. Versnel. (Longfelder Dep., Dkt.

15   No. 112, Ex. 3 at 222:10-15 (Longfelder agrees he was handling cases in the order in which he

16   was retained); Versnel Dep., Dkt. No. 103, Ex. 62 at 50:19–51:9 (solo practitioner); 30:23–316

17   (first-in-first-out method unknown to Versnel until he read Longfelder's deposition).) Many of

18   these choices, assumptions, and/or staffing realities may have contributed to delays in the

19   handling of the claims against Dr. Duyzend.

20       In addition to any delays occasioned by counsel, Continental had assigned an adjustor,

21   Mr. Hoffman, who lacked any sense of urgency. (See, e.g., Dkt. No. 112, Ex. 26 (emails from

22   Mr. Versnel to Mr. Hoffman expressing increasing frustration with Mr. Hoffman's delays in

23   paying settlements, experts, vendors, and even Mr. Versnel himself; returning calls; and

24

performing other tasks); Ex. 28 (memo written by Mr. Versnel's associate regarding possibility of bad faith claim arising from "tardy settlement checks" and "failure to respond to settlement demands"); Ex. 29 (email from dental expert to Mr. Versnel explaining that after failing to receive payment for eight months, he would hold Mr. Versnel rather than Continental responsible for the nonpayment, and complaining that "Mr. Hoffman has not been forthright with me"); Ex. 30 (emails indicating the time between the date a pro se's demand for payment for reparative dental work was communicated to Mr. Hoffman and the date an actual settlement check was issued was more than a year); Ex. 45 (email from Mr. Versnel to Mr. Hoffman explaining delays in being permitted to bill for claimants represented by Mr. Russo "is really creating hardship for me").) Mr. Hoffman was eventually fired, but Mr. Hoffman and his supervisor claim it was not for his delays in handling such an important matter; rather, they say he was fired for exceeding his settlement authority without permission. (See Kunz Dep., Dkt. No. 112, Ex. 58 at 72:9–76:11; Hoffman Dep., Dkt. No. 112, Ex. 1 at 5012–14.)

Furthermore, some delays related to the retrieval of patient records could be attributed to third parties—although Continental sometimes had a role in selecting the third-party vendors or otherwise arguably aggravating the problem. For example, in 2010 Mr. Versnel asked Continental for permission to stop using the Continental-approved Compex, a vendor providing copying services, because "they are very difficult to deal with and not in any form competent. I feel they have been an impediment to our work up of the Duyzend as well as other cases. The Duyzend cases are heating up and obtaining records in a timely manner is even more important than before." (Dkt. No. 112, Ex. 70 at 1 (4/7/2010 Versnel-Hoffman email).) At one point in 2011, Mr. Versnel explained that Dr. To was withholding records until he received payment for x-rays from Continental. (Dkt. No. 112, Ex. 60 at 1 (12/6/2011 Versnel-Lampe email).) Dr. To's

1  office assistant, April McCartney, stated that late payment of Dr. To "was an issue" and that she

2  "kind of remembered" Dr. To refusing to provided additional records to Mr. Versnel because Dr.

3  To was not being paid by Continental. (Dkt. No. 112, Ex. 69, 96:7–21.)

4       Attorneys other than Mr. Longfelder who represented Duyzend patients tended to settle

5  for higher amounts, brought CPA and intentional tort claims, and presented a greater threat of

6  taking their cases to trial and achieving runaway jury verdicts. (See Dkt. No. 112, Ex. 17–18

7  (disparity in settlement amounts between Longfelder and Russo clients); Versnel Dep., Dkt. No.

8  103, Ex. 62 at 266:13–20 (different types of claims brought by Longfelder versus other

9  attorneys); id. at 49:13–504, 52:8–53:17 (Versnel's estimates of relative willingness of

10  Longfelder, Russo, and PWRLK to take cases to trial).) Dr. Duyzend had warned in 2009 and

11  2010 that delays might jeopardize settlements and cause claimants to transfer to more aggressive

12  attorneys (Dkt. No. 112, Ex. 42 at 60, 63), and numerous claimants including the Plaintiffs in this

13  case did leave Mr. Longfelder in favor of Mr. Russo and the firm later known as PWRLK.

14  Ultimately, Plaintiffs, represented by PWRLK, took the case to arbitration and won a verdict of

15  $35,212,000. (See Dkt. No. 112, Ex. 64.) The lowest amount the firm had offered prior to

16  arbitration was $16 million; it is not clear whether Dr. Duyzend considered this offer specifically

17  but he had previously insisted on a reservation of $50,000 to ensure continued defense by

18  Continental and less than $1 million remained on the policy at the time of the offer. (Dkt. No.

19  103, Ex. 53 at 1; Dkt. No. 117, Ex. 58 at 3–4, Ex. 59 at 2.)

20                                    **Analysis**

21       I.    Legal Standard

22       Federal Rule 56(a) provides that the court shall grant summary judgment if the movant

23  shows that there is no genuine dispute as to any material fact and the movant is entitled to

24  judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether a factual dispute

1   requiring trial exists, the court must view the record in the light most favorable to the

2   nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). All material facts

3   alleged by the nonmoving party are assumed to be true, and all inferences must be drawn in that

4   party's favor. Davis v. Team Elec. Co., 520 F.3d 1080, 1088 (9th Cir. 2008).

5       A dispute about a material fact is "genuine" only if "the evidence is such that a

6   reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

7   There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational

8   trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

9   475 U.S. 574, 587 (1986).

10      II.     Fraud

11      Continental argues it is entitled to summary judgment on the basis that Dr. Duyzend

12  committed fraud "during the claims process" with Continental. (Dkt. No. 98 at 17–19.)

13  Specifically, Continental claims Dr. Duyzend perpetrated insurance fraud by denying to his

14  Continental-appointed counsel that he committed fraud on his patients. (Id. at 18.) Because the

15  arbitrator in the underlying litigation later held that Dr. Duyzend did commit fraud on his

16  patients, Continental argues Plaintiffs, who stand in Dr. Duyzend's shoes, are collaterally

17  estopped from denying that fraud in this bad faith litigation. (Id.)

18      Plaintiffs counter that 1) Continental is estopped from asserting fraud or

19  misrepresentation as a defense to bad faith because it did not timely assert the defense through a

20  reservation of rights and 2) it is judicially estopped because Continental represented to the Court

21  during discovery that coverage was not at issue in this bad faith litigation and successfully

22  asserted attorney-client privilege on all coverage matters. (Dkt. No. 111 at 11–12.) Regarding the

23  merits of the fraud claim, Plaintiffs argue that the alleged misrepresentations do not constitute

24  fraud or misrepresentation under the "void for fraud" provision of Dr. Duyzend's policy with

1    Continental. The definition of fraud which voids the policy is "any case of fraud by you relating

2    to [the policy]" or where the insured "intentionally conceal[s] or misrepresent[s] a material fact

3    or circumstance concerning [ . . . ] this policy." (Id. at 14, quoting Dkt. No. 103, Ex. 2 at 59.) In

4    addition, Plaintiffs point out collateral estoppel is not dispositive because the issues are not

5    identical—here, the issue is fraud concerning the treatment of patients versus fraud on the policy.

6    (Dkt. No. 111 at 16.) Finally, Plaintiffs attempt to distinguish the fraud line of cases on the basis

7    that they concern first-party insurance rather than third-party insurance and do not involve

8    assertions by the insured defending his or her conduct in underlying third-party litigation. (Id. at

9    15–16.)

10          In its Reply, Continental responds that it is not trying to void the policy, but rather to

11   defend against excess liability; it implies a common law defense rather than the "void for fraud"

12   provision of the policy applies. (Dkt. No. 114 at 5.) In response to the judicial estoppel argument,

13   Continental contends it is not disputing coverage, but solely excess liability. (Id. at 6.) Finally,

14   Continental admits the matter on which Plaintiffs are collaterally estopped is the fact that Dr.

15   Duyzend committed fraud on his patients, not the final issue of fraud to Continental about the

16   fact of fraud—but asserts it is undisputed that Dr. Duyzend intentionally denied committing

17   fraud in communications to Continental during the claims process. (Id. at 7.)

18          Continental is wrong that the fraud defense for bad faith actions in Washington is

19   divorced from the text of the policy. (See Dkt. No. 114 at 6.) The cases cited in Continental's

20   motion either specifically rely on "void for fraud" provisions in the policies at issue or are

21   derived from the related but inapplicable doctrine of contract rescission based on

22   misrepresentations in the application for insurance. See, e.g., Johnson v. Safeco Ins. Co. of Am.,

23   178 Wn.App. 828, 845–46 (2013) (void-for-fraud provision); Tudor Ins. Co. v. Hellickson Real

24

1   Estate, 810 F. Supp. 2d 1211, 1216, 1218–19 (W.D. Wash. 2011) (rescission based on

2   misrepresentations in insurance application; bad faith defense follows); Mutual of Enumclaw Ins.

3   Co. v. Cox, 110 Wn.2d 643, 646 (1988) (void-for-fraud provision); Wickswat v. Safeco Ins. Co.,

4   78 Wn.App. 958, 962 (1995) (void-for-fraud provision). Other cases are not relevant to the

5   question at hand. See Safeco Ins. Co. v. JMG Restaurants, 37 Wn.App. 1, 20 (1984) (approving

6   of a trial court's bifurcation of an insurer's declaratory judgment coverage action from a bad

7   faith claim specifically concerning the denial of coverage and noting that if there were no

8   coverage, "there could not have been any recovery" on the bad faith claim about the denial of

9   coverage). The fact that the text of the policy is relevant is most clearly indicated by Ki Sin Kim

10   v. Allstate Ins. Co.,153 Wn.App. 339, 359–60 (2009), a case that Continental misreads. (Dkt.

11   No. 114 at 6.) There, the Washington Court of Appeals held that "Allstate's use of the word

12   'may,' [in the void-for-fraud provision] makes it unclear under which circumstances it will

13   choose to deny coverage and to what extent its obligation is relieved by misrepresentations" and

14   remanded for trial on the question of the materiality of the insured's misrepresentations. Ki Sin

15   Kim, 153 Wn.App. at 360.

16        Plaintiffs' argument regarding the contours of the fraud cases focuses on the first-party

17   nature of those insurance contracts. While the first-party/third-party distinction is not wholly

18   borne out by the cases, see, e.g., Tudor Ins. Co., 810 F. Supp. 2d at 1213–14 (third-party errors

19   and omissions policy in rescission case), it is nonetheless true that Washington void-for-fraud

20   cases arising from the insured's conduct in the claims process bear no resemblance to the

21   allegedly fraudulent activity here, where Dr. Duyzend made a statement to his attorney denying

22   the allegation that he had performed unnecessary root canals and denying that he had fabricated

23   symptoms or chart entries. (Dkt. No. 103, Ex. 63 at 1.) Distinct policy considerations enter into

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 9

1   the question of whether a malpractice insurance policy should be voided by statements made by

2   an insured to his insurer-provided attorney while participating in the formation of defense

3   strategy. Washington courts have made exceptions to the fraud doctrines before, and there is

4   reason to believe they might do so in this context as well. See Ellis v. William Penn Life Assur.

5   Co. of Am., 124 Wn.2d 1, 14 (1994).

6       The Court need not reach this issue of Washington law (or Plaintiff's reservation of rights

7   argument), however, given that Continental disavowed any coverage arguments during the

8   discovery phase of this case. (See Dkt. No. 15 at 5, 17.) The Court relied on these representations

9   in denying discovery into coverage issues. (See Dkt. No. 40 at 2 ("Continental need not produce

10  underwriting files because Plaintiffs do not bring coverage claims.").)

11      Continental now argues that fraud is a defense distinct from coverage and that it applies

12  to excess judgments rather than the policy limits. Thus, it concludes that judicial estoppel should

13  not apply. (Dkt. No. 114 at 6.) However, the void-for-fraud doctrine in Washington has the effect

14  of voiding the policy entirely; regardless of the specific relief Continental seeks for fraud, fraud

15  affects coverage as well. As Plaintiffs have demonstrated, Continental has been redacting all

16  coverage information as attorney-client privileged. (See Dkt. No. 110, Ex. 49.) Any assessment

17  by Continental of Dr. Duyzend's alleged fraud would be encompassed in these coverage

18  analyses. The documents relevant to basic coverage and void-for-fraud issues overlap to such an

19  extent that Continental's attempt at distinguishing the two for judicial estoppel purposes fails.

20  Continental may not simultaneously use coverage as a shield and fraud as a sword. See Pappas v.

21  Holloway, 114 Wn.2d 198, 208 (1990). It is therefore judicially estopped from bringing fraud as

22  an affirmative defense in this case and summary judgment on this issue is denied.

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 10

1     **III.**     **Bad Faith**

2         Both parties move for summary judgment on the issue of bad faith, so the Court will

3 consider each side's legal arguments in turn. Under Washington law, insurer is liable "for a

4 failure to adjust or compromise a claim within the limits of liability, if that failure is attributable

5 to negligence or bad faith." <u>Hamilton v. State Farm Ins. Co.</u>, 83 Wn.2d 787, 791 (1974). Indeed,

6 "it is the affirmative duty of the insurer to make a good faith attempt to effect settlement." <u>Id.</u> at

7 791–92 (citing <u>Burnham v. Commercial Cas. Ins. Co.</u>, 10 Wn.2d 624, 631 (1941)). "The flat

8 refusal to negotiate, under circumstances of substantial exposure to liability, a demonstrated

9 receptive climate for settlement, and limited insurance coverage may show lack of good faith as

10 well." <u>Id.</u> at 794 (citing <u>Tyler v. Grange Ins. Ass'n</u>, 3 Wn.App. 167, 179 (1970)). A frequently

11 stated standard for assessing an insurer's good faith is that an insurer must make its decision as

12 to whether to settle or go to trial "as though no policy limit of liability existed." <u>See, e.g.</u>, <u>Tyler</u>,

13 3 Wn.App. at 178. Whether an insurer acted in bad faith is ultimately a question of fact. <u>See</u>

14 <u>Smith v. Safeco Ins. Co.</u>, 150 Wn.2d 478, 485 (2003). The parties argue that no reasonable jury

15 could find for the other side in light of allegedly undisputed facts.

16     **A.  Continental**

17         **1.  Records**

18         Continental argues any apparently unreasonable delay in the processing of patient claims

19 against Dr. Duyzend can be justified on summary judgment by the insurer's reasonable

20 insistence on waiting for records to be provided prior to making settlement offers. (Dkt. No. 98

21 at 20.) The cases it cites do not directly support its contention. In <u>Anderson v. State Farm Mutual</u>

22 <u>Insurance Company</u>, the Washington Court of Appeals held the insurer did not delay

23 unreasonably when it spent sixteen weeks investigating and obtaining its own independent

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 11

1   medical evaluation of the insured. 101 Wn.App. 323, 336–37 (2000). Continental does not claim

2   it delayed in order to obtain its own evaluations of Dr. Duyzend's patients; rather, it argues it

3   was waiting passively for plaintiffs' attorneys to provide those records one batch at a time.

4        Weinstein & Riley, P.S. v. Westport Insurance Corp. is factually distinguishable as well.

5   See No. C08-1694JLR, 2011 WL 887552, at *27 (W.D. Wash. Mar. 14, 2011). There, a legal

6   professional liability insurer admitted it was obligated to pay attorneys' fees expended on a

7   covered matter, but it did not reimburse plaintiffs for four months while it waited for plaintiffs to

8   send their billing statements. Id. The billing statements and information about which bills

9   corresponded to the covered claim were already in the possession of plaintiffs or plaintiffs'

10  counsel in that case. Here, the dental records were not controlled by the plaintiffs (though they

11  had to sign releases) or the plaintiffs' attorneys, such as Mr. Longfelder, but were either held by

12  Dr. To, the dentist who had purchased Dr. Duyzend's practice; Dr. Duyzend himself; or third

13  parties. (See Versnel Decl., Dkt. No. 104 at 30 ("I understood that Mr. Longfelder was having

14  difficulties obtaining records from Dr. To."); id. at 35 ("I attempted to get access to Mr.

15  Longfelder's clients' records by serving discovery on Mr. Longfelder, but that was unsuccessful.

16  I eventually agreed with Mr. Longfelder to subpoena records directly from Dr. To."); Longfelder

17  Dep., Dkt. No. 103 at Ex. 17, 109:6–110:13 (explaining that some delay was attributable to his

18  ability to process records, but that other delay was attributable to Dr. To, and that Dr. Duyzend

19  had some patient records in his basement and other patients had taken their records to third-party

20  providers).)

21        While Continental offers evidence that Mr. Longfelder was the source of the delays,

22  Plaintiffs counter that Dr. To was responsible and that Continental should have sought releases

23  from plaintiffs so that it could obtain records directly. In reply, Continental points to the

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 12

1   declaration of Mr. Versnel, who claims he "drafted a consent form for Mr. Longfelder's clients"

2   but does not give a date for this action (Dkt. No. 104 at 4), and a 2011 email from Mr. Versnel's

3   offices proposing that a third party service retrieve records from Dr. To's office directly. (Dkt.

4   No. 115, Ex. 2 at 1–2.)

5        These disputed facts and timelines are material to the jury's assessment of whether

6   Continental acted reasonably and in a manner consistent with its obligations to complete a

7   "prompt" investigation of the claims. See WAC 284-30-370. The Court cannot state as a matter

8   of law that the duty to obtain dental records in Washington rests solely on plaintiffs' counsel and

9   the insurer is absolved of any duty to investigate independently until it obtains those records.

10  Continental's motion on these grounds is therefore denied.

11             2.   October 28, 2008 Letter

12       The Court's Order on the Motion to Dismiss rested in part on an October 28, 2008 letter

13  from Mr. Longfelder suggesting a tender of policy limits, which Plaintiffs alleged Continental

14  had ignored. (See Dkt. No. 56 at 6, 8.) At the time the Motion to Dismiss was being briefed,

15  Plaintiffs rested their bad faith claim primarily on the theory that Continental should have

16  pursued a global resolution of the claims early on; with the benefit of discovery, they now argue

17  in the alternative that the implementation of the claim-by-claim strategy was unreasonable. (See

18  Pl's Mot., Dkt. No. 109 at 9.) In its motion, Continental presents evidence that it responded

19  informally to the October 28 letter through a phone call by Mr. Versnel. (Dkt. No. 103, Ex. 17 at

20  82:18–84:4.) Plaintiffs' effort to distinguish Mr. Versnel from Continental is not persuasive. (See

21  Dkt. No. 111 at 20.) Mr. Longfelder was negotiating with Mr. Versnel, Continental-appointed

22  counsel for Dr. Duyzend and the ordinary means for claimants to communicate with Continental.

23  Mr. Longfelder would have expected a response from Mr. Versnel, not Mr. Hoffman. However,

24

1   this fact does not resolve the disputed question of whether Continental's response was

2   reasonable. Continental does not merit summary judgment on the sole ground that it responded

3   to Mr. Longfelder's letter.

4              3.   Global Resolution/Claim-by-Claim Approach

5          As noted above, Plaintiffs no longer assert that Continental was required to pursue a

6   global resolution early in the claims process. Continental nonetheless argues it is entitled to

7   summary judgment on the basis that its failure to pursue a global settlement approach was

8   reasonable. (Dkt. No. 98 at 23.) As the parties' voluminous briefing demonstrates, there are

9   many disputed facts about the reasonableness of Continental's approach to settling cases. And

10  while Continental points to out-of-circuit case law stating that insurers are entitled to settle

11  claims on a first-come, first-served basis, see Voccio v. Reliance Ins. Cos., 703 F.2d 1, 3 (1st Cir.

12  1983), that case relied on Rhode Island law; reached its holding on the basis of causation, not

13  strategy; and involved a relatively simple factual scenario in which one of two claimants had a

14  claim that alone was valued in excess of the policy limits. Continental may have been entitled to

15  pursue settlements on a first-come, first-served basis, but only if that was part of a reasonable

16  attempt to avoid exceeding policy limits. Continental also argues that it could not have breached

17  a duty to defend claims it did not know existed. (Dkt. No. 98 at 23–24.) But under Washington

18  law, Continental should have estimated the aggregate value of the claims in order to determine

19  whether the limits were at risk. See Tyler, 3 Wn. App. at 178 (describing no-limits test). Under

20  the unique facts here, the universe of potential claimants may have been larger than that posed by

21  many dental insurance claims, but it was bounded by the number of patients Dr. Duyzend had

22  treated within the limitations period. When the facts are viewed in the light most favorable to

23  Plaintiffs, Continental's failure to make a considered choice using the available information

24

1  could lead a jury to conclude its prolonged claim-by-claim approach over the course of several

2  years was not reasonable.

3          4.  Consent

4        Continental contends it is entitled to summary judgment based on Dr. Duyzend's consent

5  to a claim-by-claim approach. (Dkt. No. 98 at 26–27.) Continental is entitled to argue to a jury

6  that a global resolution method that would have invited publicity was not in Dr. Duyzend's best

7  interests. But a layman's assent to the basic outline of a settlement process on the advice of his

8  counsel—particularly in absence of any warning from the insurer that the claims might exceed

9  policy limits—cannot be converted into immunity as a matter of law for aspects of the claims

10  handling process that he either did not consent to or did not have the education or information to

11  assess.

12          5.  Causation

13        Continental argues no reasonable jury could conclude there was causation between

14  Continental's conduct and the excess judgment at arbitration. (Dkt. No. 98 at 27–29.) As an

15  initial matter, Continental is wrong that no presumption of harm applies in this case. It is true

16  that no presumption of harm applies where there are statutory violations in the absence of

17  coverage (what is termed "procedural bad faith"). <u>See</u> <u>Coventry Assocs v. Am. States Ins. Co.</u>,

18  136 Wn.2d 269, 281 (1998); <u>St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.</u>, 165 Wn.2d 122, 133

19  (2008). But a presumption of harm in the amount of the excess judgment applies in policy-based

20  third-party bad faith cases both with and without reservations of rights. <u>See</u> <u>Tank v. State Farm</u>

21  <u>Fire & Cas. Co.</u>, 105 Wn.2d 381, 387 (1986); <u>Besel v. Viking Ins. Co. of Wisconsin</u>, 146 Wn.2d

22  730, 737 (2002).

23

24

1    Continental is entitled to rebut this presumption, and indeed, this case presents a closer

2    case for causation than many cases in which the presumption is applied. But Continental's

3    attempt to erect a wall between an excess judgment and the cumulative impact of cases that

4    settled prior to the excess judgment is unavailing; clearly, before a policy can be exceeded, its

5    limits must be met. Continental must argue its causation case to the jury.

6       B.  Plaintiffs

7    Plaintiffs argue they are entitled to summary judgment on the issue of bad faith because

8    Continental failed to perform the "no-limits" test by not estimating the aggregate value of the

9    claims against Dr. Duyzend, violated various provisions of the Washington Administrative Code,

10   and failed to take affirmative steps to effectuate settlement of claims within policy limits. (Dkt.

11   No. 109 at 6–11.) Plaintiffs further argue that causation is not in dispute because there was a

12   "[demonstrated] receptive climate for settlement" and the presumed measure of damages is

13   conclusive. (Dkt. No. 109 at 11–12.) As noted above, there is a presumed measure of harm in

14   bad faith cases which may be rebutted. Unlike the simple factual scenarios through which the

15   doctrine of bad faith was developed, this case does not involve a single within-limits offer prior

16   to trial which the insurer refused to entertain. Though many undisputed facts show that

17   Continental's claims adjustor and appointed defense counsel did not adhere to best practices with

18   regard to estimating the aggregate value of the claims against Dr. Duyzend and taking

19   affirmative steps to bring about settlement of claims in a timely manner, the causal link between

20   those failures and the more than $35 million arbitration verdict is hotly contested. Summary

21   judgment on bad faith for Plaintiffs is therefore denied.

22

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 16

1    IV.    Continental on Breach of Contract and Negligence

2         Continental also moves for summary judgment on Plaintiffs' breach of contract and

3    negligence claims. In the prior Motion to Dismiss, the Court made clear that Plaintiffs could not

4    alleged breach of contract (as opposed to extra-contractual tort claims) on the sole basis of WAC

5    violations. (Dkt. No. 56 at 8.) Plaintiffs amended the breach of contract claim in their complaint

6    to allege both WAC violations and breach of timely indemnification; they assert damages in the

7    amount of the excess judgment and Dr. Duyzend's partial satisfaction of that judgment. (See

8    Dkt. No. 57 at 6–8.)

9         Continental now argues that since it has paid the remaining policy limits to Plaintiffs,

10    there are no damages for breach of contract or negligence. The limitation on "legal action" in Dr.

11    Duyzend's policy states,

12         You may not bring any legal action against us concerning this policy until:

13         A. you have fully complied with all the provisions of this policy; and
          B. the amount of your obligation to pay has been decided. Such amount can be set by
14         judgment against you after actual trial or by written agreement between you, us and the
          claimant.

15
          Any entity, or their legal representative, is entitled to recover under this policy after they
16         have secured a judgment or written agreement. Recovery is limited to the extent of the
          insurance afforded by this policy [ . . . . ]

17
    (Dkt. No. 103, Ex. 2 at 59.)

18
         Under Washington law, "the insured is only entitled to recover damages up to the
19
    insurance policy limits" in an action based on the policy. Tribble v. Allstate Prop. & Cas. Ins.
20
    Co., 134 Wn.App. 163, 169 (2006). Since Continental has disbursed the policy limits to
21
    Plaintiffs, there can be no further recovery on the breach of contract claim. Summary judgment
22
    on breach of contract is therefore granted.
23

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 17

1    However, a negligence claim is not inherently limited to contract damages. See Tribble,

2  134 Wn.App. at 169 (distinguishing damages available for negligence and bad faith from

3  damages available pursuant to the policy). And although Continental is correct that "[t]he general

4  rule is that a party to a contract can limit liability for damages resulting from negligence," Am.

5  Nursery Prods., Inc. v. Indian Wells Orchards, 115 Wn.2d 217, 230 (1990), "[e]xculpatory

6  clauses are strictly construed and must be clear if the exemption from liability is to be enforced."

7  Scott v. Pac. W. Mountain Resort, 119 Wn.2d 484, 490 (1992). The clause in Dr. Duyzend's

8  policy appears at least to limit damages for claims for indemnification (i.e., breach the

9  "obligation to pay") to "the extent of the insurance afforded by this policy," but does not

10  specifically exclude negligence claims. Because the clause must be strictly construed,

11  Continental is not entitled to summary judgment on the negligence claim on the basis that it has

12  already paid policy limits.

13    V.    Plaintiffs on Affirmative Defenses

14    Finally, Plaintiffs argue Continental's many affirmative defenses fail as a matter of law.

15  Affirmative defenses plead matters extraneous to the plaintiff's prima facie case, which deny

16  plaintiff's right to recover, even if the allegations of the complaint are true. Fed. Deposit Ins.

17  Corp. v. Main Hurdman, 655 F.Supp. 259, 262 (E.D. Cal. 1987).

18    A.  Failure to State a Claim and Statute of Limitations

19    As Plaintiffs note, the Court has already held that Plaintiffs did not fail to state a claim

20  and the statute of limitations had not run on claims alleging injury based on the entry of the

21  arbitration judgment. (See Dkt. No. 56.) Plaintiffs' motion for summary judgment on these

22  affirmative defenses is therefore granted.

23

24

1  B.  Comparative Fault

2  Plaintiffs claim they are entitled to summary judgment on the issue of comparative fault

3  because jurisdictions outside Washington do not countenance comparative fault on bad faith

4  claims. (Dkt. No. 109 at 14–15.) Continental is correct, however, that certain WAC provisions

5  impose duties on insureds, see, e.g., WAC 284-3-70, and Washington also requires juries to

6  assess comparative fault in any case where the fault of another entity is relevant. RCW 4.22.070.

7  Plaintiffs have not shown that comparative fault is irrelevant as a matter of law.

8  C.  Waiver, Ratification, Consent, Estoppel, and Failure to Mitigate

9  Plaintiffs argue this category of defenses is legally insufficient because of Dr. Duyzend's

10  status as a nonlawyer insured. (Dkt. No. 109 at 16–19.) This argument overlooks Dr. Duyzend's

11  contractual right to veto settlements, his ability to contribute personal assets to a global

12  settlement, and the fact that a $16 million settlement offer was communicated prior to the

13  arbitration. Plaintiffs are not entitled to summary judgment on these affirmative defenses simply

14  because Dr. Duyzend was not trained as an attorney. In addition, the fact that any breach of the

15  duty of good faith took place before 2012 does not prevent Continental from arguing about

16  events relevant to damages incurred through the 2013 arbitration verdict. (See Dkt. No. 109 at 20

17  n.8.)

18  D.  Collateral Estoppel, Unjust Enrichment, and Unclean Hands

19  Continental's arguments on collateral estoppel and unjust enrichment largely parrot the

20  fraud defense it unsuccessfully argued in its own motion. (See Dkt. No. 116 at 26–28.) Because

21  Continental denied any discovery into coverage issues, it is judicially estopped from bringing

22  defenses that would have been assessed in a coverage analysis. Unclean hands is a distinct

23  equitable defense that does not directly undermine enforcement of a contract. However, it is only

24

1    available as a defense to equitable relief. See Geary v. ING Bank, FSB, Nos. 43712–1–II,

2    44619–7–II, 2014 WL 4109714, *8 (citing J.L. Cooper & Co. v. Anchor Sec. Co., 9 Wn.2d 45

3    (1941)). Here, Plaintiffs seek no equitable relief, so the doctrine is inapplicable. (See Dkt. No. 57

4    at 10–11.)

5        E.  Excessive Damages

6        Plaintiffs also move for summary judgment on Continental's "excessive damages"

7    affirmative defense. (Dkt. No. 109 at 24–25.) Attacking the method that Plaintiffs propose to

8    calculate damages is not an affirmative defense, though Continental is free to make similar

9    arguments with respect to the instructions to be provided to the jury. Continental's argument that

10   damages must be capped at the policy limits for negligence, meanwhile, has already been

11   rejected above. Summary judgment for Plaintiff is therefore granted on the affirmative defense of

12   excessive damages.

13

14                                       **Conclusion**

15       Continental's and Plaintiffs' motions for summary judgment are both DENIED with

16   respect to Plaintiffs' bad faith claim because of the existence of many disputed facts material to

17   the claim. Continental's motion is DENIED with respect to the fraud defense because it is

18   judicially estopped from asserting it. Continental's motion on the basis that the policy limits have

19   already been disbursed is GRANTED as to breach of contract but DENIED as to negligence.

20   Plaintiffs' motion for summary judgment on Continental's affirmative defenses is GRANTED as

21   to failure to state a claim and affirmative defenses, DENIED as to comparative fault, waiver,

22   ratification, consent, estoppel, and failure to mitigate, and GRANTED as to collateral estoppel,

23   unjust enrichment, unclean hands, and excessive damages.

24

1

2     The clerk is ordered to provide copies of this order to all counsel.

3     Dated this 21st day of November, 2014.

4

5

6                                        Marsha J. Pechman
7                                        Chief United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 21